573 A.2d 1027

**COMMONWEALTH of Pennsylvania**

v.

**Jose Alberto RAMOS, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 21, 1989.

Filed March 12, 1990.

Reargument Denied May 22, 1990.

584

Vincent J. Quinn, Lancaster, for appellant.

Henry S. Kenderdine, Jr., Dist. Atty., Lancaster, for Com., appellee. (submitted)

Before TAMILIA, KELLY and CERCONE, JJ.

KELLY, Judge:

In this case we are called upon to decide whether a finding of possession with intent to distribute is necessarily precluded, when the amount of drugs found in a defendant's possession is fully consistent with possession for personal use. We find that the amount of drugs possessed is merely one factor in determining whether a charge of possession with intent to deliver can be sustained. We find the totality of the circumstances sufficient to sustain a finding of the requisite intent to deliver notwithstanding the relatively small amount of drugs· involved. Consequently, we affirm the adjudication and disposition order for delinquency in this case.

## I. *The Drug Problem*

Anyone with even a passing acquaintance with our criminal justice system or the popular media cannot help but be aware that America is engaged in a war on drugs, and that Pennsylvania is one of the battlegrounds. Though Philadelphia and Pittsburgh, like other urban centers across the country, have been hardest hit, there can be no question as to the accuracy of Attorney General Ernest Preate's grim observation that, there is "no community in Pennsylvania, no matter how tranquil, no matter how rural, that is immune from drugs. Every single county ... has a serious drug-problem." [1] The Crime Commission echoed that assessment in its most recent report:

"The drug problem is the number one organized crime problem in Pennsylvania."

---

**1.** Seeyle, "The Drug Culture is Sinking Deep Roots in Rural Pa.," *Philadelphia Inquirer,* at 1A (April 4, 1988); *cf.* Kelly, "Cocaine, Other Hard Drugs Invade Rural Areas," *USA Today,* at 11A (December 20, 1989); Baker, "The Newest Drug War: In Rural America Crack and Crank Are Now Hot Commodities in the Backwoods," *Newsweek,* at 20 (April 3, 1989). We note that 53% of the 20,211 drug abuse violations reported in 1987 arose outside Philadelphia and Allegheny Counties. *See 1987—Pa Uniform Crime Report,* at 91–93, A–7 (1989). As early as 1978, a survey of law enforcement officials across the Commonwealth revealed that 62% felt that their local drug problems had already reached "serious" to "crisis" proportions. *See* "Final Report of the Special Senate Committee to Investigate the Drug Laws of Pennsylvania," *Appendix to the Senate Legislative Journal—1978,* at 122 (1978).

The Pennsylvania Crime Commission–1987 Report

This prognosis has not changed today. Throughout every city, town, village, and hamlet, the availability of narcotics, and in particular cocaine and its derivative "crack," threatens the quality of life in this Commonwealth. Rural communities, once perceived as safe havens from urban crime, are now confronted with a scourge that has reached epidemic proportions.

*Pennsylvania Crime Commission—1989 Report,* at 1 (1989).

Focusing more directly on drug trafficking, former Attorney General Leroy Zimmerman reported in 1988:

The Attorney General's Narcotics Strike Forces have, by statute, primary responsibility for combatting illegal drug trafficking throughout the Commonwealth.

\* \* \* \* \* \*

The strike forces have over the previous seven years arrested 10,687 suspects, almost all of them drug dealers. The number of arrests per year has increased steadily, going from 1,223 in 1981 to 2,397 last year. And that has occurred even though the emphasis has been on producing quality cases, not quantity.

Strike force arrest records bear witness to the explosive growth of cocaine as the drug of choice in Pennsylvania: In 1984 there were 320 cocaine-dealer arrests; in 1987, there were 1,065 arrests involving powder-form cocaine and another 22 for new, cheap, potent and deadly "crack" form. That is a 300 percent increase in cocaine-dealer arrests in four years. The 1988 totals will be higher.

Zimmerman, *Office of Attorney General—The First Eight Years,* at 11 (November, 1988). The combined efforts of state and local law enforcement officers in Pennsylvania resulted in 6,640 arrests for cocaine or opium trafficking in 1987; 4,649 such arrests had been made in 1986. *See 1987—Pa. Uniform Crime Report, supra,* at A–10; *1986— PA Uniform Crime Report,* at A–10 (1987); *cf. Strategies for Improving Criminal and Juvenile Justice Within Pennsylvania,* at 3 (PCCD 1989) (discussing drug arrest

statistics from 1981–1987 and related issues); *Trends and Issues in Pennsylvania's Criminal Justice System,* at 66–73 (PCCD 1988) (same). Pennsylvania's drug problem is obviously severe.

The drug problem has had a particularly devastating impact on our juvenile population. In 1986, a national survey of high school seniors indicated 17% had tried cocaine and 13% had used cocaine in the past 12 months. In 1987, 15% indicated they had tried cocaine, 10.1% had used it in the past year, 4.3% had used it in the past month, 5.6% had tried crack, and 4.0% had used crack in the past year. In 1988, 12% indicated they had tried cocaine, 8% had used cocaine in the past year, 3.4% had used cocaine in the past month, 4.8% had tried crack, and 3.0% had used crack within the past year.[2] A separate 1987 study revealed that 4% of *eighth* graders and 10% of *tenth* graders admitted having used cocaine.[3] While these statistics indicate a positive trend away from adolescent cocaine use, the percentages are nonetheless staggering by themselves, and are generally conceded to *underestimate* actual teenage cocaine use because of the absence of high school dropouts from the surveys.[4]

**2.** *See* Squires, "Getting 'Unhooked:' High School Seniors Report Declining Use of Drugs," *Washington Post,* page Z28 (March 7, 1989); Mesce, "Drug Data is an Upper," *Delaware County Daily Times,* at 11 (March 1, 1989); Jehl, "Hot, Hip & Happening," *Los Angeles Times,* part 9, page 4 col. 1 (March 10, 1989); Berke, "Student Survey Detects Decline In Use of Crack," *New York Times,* sect. A, page 16, col. 2 (March 1, 1989); Isikoff, "Survey of Student Drug Abuse Finds Lowest Levels in Decade," *Washington Post,* page A1 (March 1, 1989); Jehl, "High School Seniors' Drug Use Drops to Lowest Level Since '75," *Los Angeles Times,* part 1, page 14, col. 2 (March 1, 1989); *see also* Czechowitz, *Adolescent Alcohol and Drug Abuse and Its Consequence,* 14 Am.J. Drug Alcohol Abuse 189, 191 (1988); Brower & Anglin, *Adolescent Cocaine Use,* 17 Journal of Drug Education 163, 165–68 (1987).

**3.** *Results from National Adolescent Student Health Survey,* 38 MMWR 146, 148 (March 10, 1989).

**4.** Squires; *supra,* at n. 2 (dropout use estimated at 50 to 65 percent higher than the rate for in school survey participants); Berke, *supra,* at n. 2 (the percentage of dropouts estimated at 15%); Beauvis & Oetting, *Drug Use in an Alternative High School,* 16 Journal Drug Education 43, 43–50 (1986) (reporting significantly higher drug usage rates for problem students and returning dropouts in special schools).

The role of juveniles in drug distribution is even more disturbing. In 1986, 311 youths under 18 years old were arrested on opium or cocaine distribution charges in Pennsylvania; in 1987, 532 were arrested on such charges. Though serious by themselves, it is universally conceded that those arrest statistics reflect only the "tip of the iceberg" as far as the actual incidence juvenile cocaine trafficking in Pennsylvania is concerned. One expert has explained: "... their selling activity is managed so that even the most active "dealers" appear to be small-time sellers. As a result, they are rarely arrested for drug sales...." Carpenter, *et al.*, *Kids, Drugs, and Crime*, at 59 (1988).

In its 1989 Report, the Crime Commission reported:

Another dimension of the cocaine and crack market is the high number of youth who are attracted to the lure of "quick money." Unlike other rackets, such as numbers gambling and loansharking, the number of teenagers and young adults who are active in the cocaine market is relatively high. This accounts for the reason there are relatively higher rates of violence in the cocaine/crack markets; youthfulness and violence are statistically related. Unlike more established and mature criminal markets, such as gambling, the cocaine market (as distinguished from the heroin market) is quite transient, and the youth involved represent a never-ending reserve labor force for criminal entrepreneurs and organizations. The Commission has found that it is not unusual for children in their teens to earn as much as $100 a day for participating in these distribution networks. *Youth gangs and younger children are more involved in the cocaine market than was the case two years ago.*

*Pennsylvania Crime Commission: 1989 Report, supra,* at 3 (emphasis added); *see also* Hopkins, "Crack: The Organization of the Market," *in Organized Crime Narcotics Enforcement Symposium,* at 124–26 (Pa.Crime Commission 1988) (describing teenage "crew" drug trafficking operations involving lookouts, hawkers, runners, stashers, se-

curity enforcers, sellers, and crew chiefs). This phenome-
non is not peculiar to Pennsylvania, similar cocaine market
structures are reported nationwide:

> Lookout is the entry level position for nine- and ten-year
> olds. They can make $100 a day warning dealers when
> police are in the area. Sometimes the pint-sized appren-
> tice is rewarded with the most fashionable sneakers,
> bomber jacket, or bicycle. The next step up the ladder is
> runner, a job that can pay more than $300 a day. This is
> the youngster who transports the drugs to the dealers on
> the street from the make-shift factories where cocaine
> powder is cooked into rock-hard crack. Finally, an enter-
> prising young man graduates to the status of the dealer,
> king of the street. In a hot market like New York City,
> an aggressive teenager dealer can make up to $3,000 a
> day.

Lamar, "Kids Who Sell Crack," *Time*, at 20 (May 9, 1988);
*see also* Wylie, "The Crack Epidemic," *Family Therapy
Networker*, at 14 (Jan/Feb. 1989) (Bill Hopkins, director of
street research for the New York State Division of Drug
Abuse, reported that 12– and 13–year olds commonly make
$150 to $250 a day as lookouts, stashholders, and messen-
gers); Gold, *800–Cocaine*, at 85 (3rd Ed.1986) (quantity
dealers organize small groups of street pushers, lookouts,
and couriers, ..., who distribute the drugs on the street).

While money is an important inducement, it is not the
only force behind the juvenile employment boom in drug
trafficking. To the contrary, upper level dealers actively
recruit juveniles because they are generally trustworthy,
cheap labor, and easily disciplined. Moreover, unlike adults
who face hard-time under stiff adult narcotics laws, the
juvenile justice system's "slap on the wrist" response to
juvenile participation in drug trafficking activities has low-
ered the likelihood of betrayal by juvenile employees mak-
ing plea bargains, and has made the juveniles a uniquely
recyclable criminal workforce. *See* Williams, *The Cocaine*

*Kids*, at 9 (Addison–Wesley 1989); Kramer, *At A Tender Age*, at 63–64 (Holt & Co.1988).[5]

This case, involving a juvenile arrested for possession with intent to deliver cocaine and heroin in Lancaster County, illustrates both the reach of drugs into rural Pennsylvania, and the grip it holds on our youth population. It is against this backdrop that we conduct our review of the instant case.

## II. *Facts and Procedural History*

The facts of this case have been set forth accurately in the opinion of the trial court as follows:

**5.** *See also* Lamar, "Where the War is Being Lost," *Time*, at 21 (March 14, 1988) ("since courts are generally lenient on young offenders and juvenile detention facilities are overcrowded, adolescents are ideal runners and street dealers"); Harrison, "Drug Dealing Posses," *Los Angeles Times*, part 1, page 1., col. 1 (January 3, 1989) (children were used because they were easily recruited and cheap, and because the drug organizations felt that if the children arrested nothing would happen to them and they would be back out on the street, an assessment Capt. Dave Barton of the Kansas City Police Department characterized as "to a large extent true"); Wines, "Against the Tide, Only a Holding Action," *New York Times*, sect. A, page 1, col. 2 (June 24, 1988) (detailing how arrests in the streets are lost in the courts, noting procedural dismissals, light sentencing generally, and particularly criticizing a 90–day sentence for a dealer arrested with 40 crack vials who had four prior arrests); *cf.* Moore, "Dead Zones," *U.S. News & World Report*, at 28 (of 185,483 state and federal drug arrests nationwide in 1986, only 28,281 spent more than one year in jail on charges arising from the arrests).

We note that legislatures have begun to address this problem by enacting stiff penalties for the use of juveniles in drug trafficking operations. In Pennsylvania, a mandatory minimum sentence of two years imprisonment applies if it is established at sentencing that a person convicted of possession with intent to deliver, delivered drugs to a juvenile with intent to enlist the juvenile in drug trafficking. 18 Pa.C.S.A. § 6314. Attacking the problem more directly, the federal government has made it an additional distinct crime to employ a juvenile in a drug trafficking operation. *See* 21 U.S.Code § 845(b); *see also United States v. Valencia Roldan*, 893 F.2d 1080 (9th Cir.1990) (1990 W.L. 973); *United States v. Carter*, 854 F.2d 1102 (8th Cir.1988). Bills to enact a similar additional distinct offense are currently pending in our legislature. *See* SB 841, Session of 1989; SB 616, Session 1989; HB 1930, Session of 1989. Both of these approaches attempt to discourage the use of juveniles in drug trafficking, while preserving the initial rehabilitative orientation of the juvenile justice system toward juveniles involved in drug trafficking. Their recent vintage precludes assessment of their efficacy and/or adequacy in addressing the problem of juvenile involvement in drug trafficking.

[O]n August 19, 1988, at approximately 10:20 o'clock P.M., Captain James J. Benedict and Lieutenant Larry F. Wolpert of the Lancaster City Police Department responded in plain clothes in an unmarked vehicle to the scene of a shooting in the one hundred block of Green Street, Lancaster City. (N.T. at 5, 11, 12). After their duties in the area were completed, the two officers returned to the unmarked vehicle which was parked on Palm Street, approximately ten feet from the intersection of Green and Palm Streets. (N.T. at 8, 12).

As he was approaching the hood of the vehicle and from about ten to twelve feet away, Captain Benedict observed in plain view a young man kneeling on the pavement by the unmarked vehicle and reaching underneath the vehicle with an object in his hand. (N.T. at 5, 8, 9, 15). The Captain identified the young man as the juvenile, Jose Alberto Ramos. (N.T. at 5).

While Lieutenant Wolpert detained the juvenile, Captain Benedict reached under the police cruiser and with his flashlight, observed and found a small, black 35 millimeter film container with a gray lid. (N.T. at 5, 9, 12). Upon opening the cannister, the police found it to contain ten heat sealed plastic packets containing white powder. After testing the powder, nine plastic bags were found to contain a total of 1.33 grams of cocaine and the tenth bag contained .07 grams of heroin. (N.T. at 3, 6, 13, 19, 21, chemist's report). By stipulation of counsel, the chemist's report and its contents were admitted into evidence without the testimony of the chemist. (N.T. at 3, 4). Nothing else was found under the vehicle, not even debris. (N.T. at 6, 6, 9, 11).

The juvenile did not answer the officer's questions about the container, alleging that he did not understand English, although he testified in English at the adjudicatory hearing without the assistance of an interpreter. (N.T. at 5, 8, 12, 22–27).

The juvenile was transported to the Lancaster Police Station, where he was turned over to juvenile authorities.

(N.T. at 6, 13). The juvenile told the police, and testified at the adjudicatory hearing, that he had simply tossed a lighted match under the vehicle and then had stooped down to extinguish it. He denied any involvement with drugs. (N.T. at 19, 20, 22–24).

(Tr.Ct.Op. at 2–4). Appellant was adjudicated a delinquent child, placed on probation in the custody of his parents upon the express condition that he attend school, and ordered to perform seventy hours of community service. This timely appeal followed.

### III. *Sufficiency of the Evidence*

On appeal, appellant contends that the evidence was insufficient to support the trial court's finding that appellant possessed heroin and cocaine with the intent to deliver. Specifically, appellant disputes the trial court's inference that the circumstances support the essential element of appellant's intent to deliver the controlled substances. 35 Pa.S.A. § 780–113(a)(30). Appellant argues that the relatively small amount of heroin and cocaine involved negated the inference drawn by the trial court that appellant intended the drugs for delivery or sale. We find no merit in this contention.

■ In reviewing the sufficiency of the evidence, the evidence must be viewed in the light most favorable to the Commonwealth, and the Commonwealth is entitled to all favorable inferences which may be drawn from the evidence. *Commonwealth v. Pearsall*, 368 Pa.Super. 327, 328, 534 A.2d 106, 108 (1987). We must then determine whether that evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove guilt beyond a reasonable doubt. *Commonwealth v. Pagan*, 315 Pa.Super. 7, 461 A.2d 321 (1983).

■ It is well settled that all the facts and circumstances surrounding possession are relevant in making a determination of whether contraband was possessed with the intent to deliver. *Commonwealth v. Fisher*, 316 Pa.Super. 311, 322, 462 A.2d 1366, 1371 (1983); *cf. Common-*

*wealth v. Macolino*, 503 Pa. 201, 205, 206, 469 A.2d 132, 134 (1983). Moreover, the Commonwealth may establish the essential elements of a crime by wholly circumstantial evidence. *Commonwealth v. Brown*, 336 Pa.Super. 628, 486 A.2d 441 (1984); *Commonwealth v. Macolino, supra,* 469 A.2d at 134–35.

It is true, as appellant asserts, that possession a small quantity of drugs, *by itself,* will not establish possession with intent to deliver, as opposed to possession for personal use. *See Commonwealth v. Smagala,* 383 Pa.Super. 466, 557 A.2d 347 (1989); *Commonwealth v. Bagley,* 296 Pa.Super. 43, 442 A.2d 287 (1987); *Commonwealth v. Pagan, supra.* This fact, however, does not compel acceptance of appellant's claim that the evidence in this case was therefore insufficient to establish possession with intent to deliver.

In *Commonwealth v. Pagan,* a small amount of marijuana was found during a lawful search of the defendant's home. 461 A.2d at 322. The panel in *Pagan* emphasized that the circumstances surrounding the possession, though suggestive of possible drug dealing, were not sufficient to raise a compelling inference that Pagan's possession of the marijuana was for sale rather than personal use. 461 A.2d at 323.

In *Commonwealth v. Bagley,* defendants being pursued by police threw a small package containing eleven glassine bags of heroin, from their car. 442 A.2d at 288. Given the fact that possession of heroin *for personal use* is a serious crime, the mere fact that the defendants ditched their drugs upon seeing or fleeing from pursuing police did not provide a logical and compelling basis to conclude that their possession of the small amount of heroin involved had been for sale, rather than for personal use.

Finally, in *Commonwealth v. Smagala, supra,* a small amount of drugs, a large amount of cash, various items of drug paraphernalia and index cards with names and numerical values were seized during a consensual search. The panel majority held that the evidence was insufficient to

support a compelling inference of possession for sale rather than possession for personal use. The majority placed particular emphasis on the fact that the drug paraphernalia found was consistent with personal use, and that a subsequent search of Smagala's residence found no evidence of drug distribution activities. The dissent, reviewing the same evidence, agreed with the trial court that the evidence was sufficient to sustain the possession with intent to distribute conviction.

Significantly, all three cases cited by appellant were decided based upon the conclusion that the totality of the circumstances, reviewing the peculiar facts in each case, were insufficient to raise a compelling inference of possession with intent to distribute, rather than possession for personal use. Neither *Smagala,* nor *Bagley,* nor *Pagan,* however, involved circumstances vaguely analogous to those in the instant case.

■ Here, plain clothes officers observed, in plain view at close range, a juvenile suspect (who was unaware of the immediate presence of the police), conceal a small film case, containing nine heat sealed pre-packaged street sale units of cocaine and one of heroin, in a hidden but readily accessible location under a parked car, at a street corner, after 10:20 P.M. on the night in question. While noting that this was not the strongest possession with intent to distribute case he had ever seen, the trial court found the evidence sufficient to sustain an adjudication of delinquency on that charge. We agree.

The conduct observed by the officers was strongly suggestive of drug *dealer* rather than drug *user* behavior. Teenage drug dealers on the street keep minimum street inventories which they replenish as needed.[6] They often

6. *See generally* "Anti–Drug Unit Hits W. Phila.," *The Philadelphia Tribune,* at 8–A (April 28, 1989) (young street dealers keep minimum street inventories which they replenish as needed, and stash the drugs in hidden but accessible locations to avoid arrests and seizures); Sills, "Dealers Buy and Rent Drug Corners," *Philadelphia Daily News,* at 3 (April 19, 1989) (young street dealers keep minimum street inventories which they have periodically replenished); Kleinman, "Goals and

stash inventories under parked cars or in other hidden but accessible locations to avoid arrest and/or inventory loss.[7] Finally, teenage street dealers sell drugs in pre-packaged street units, and by 1988 had begun selling cocaine and heroin at the same locations.[8]

Significantly, any suggestion of possession of the drugs by appellant for personal use, rather than for sale or delivery, stands wholly unsupported in this record. Appellant disclaimed any possession of the drugs at all, gave a wholly implausible and incredible explanation of his conduct (that he had only leaned under the car to put out with his hand a lit match which he had dropped), and in no way suggested that he had *ever* used *either* cocaine *or* heroin personally.[9]

In summary, we conclude that while presence of a large amount of drugs, by itself, may negate any inferences and refute any claim of possession for personal use,[10] the

Tactics in Local Drug Enforcement, *in Organized Crime Narcotics Enforcement Symposium,* at 37 (Pa.Crime Com'm 1988) (dealers store drugs underneath parked cars to keep them close at hand while reducing risk of arrest and inventory loss); Hopkins, *supra,* at 124–126 (street drug dealers keep small drug inventories close at hand for drive-by sales, and then replenish the inventories as needed); *cf.* Queen, "Pushers Back in Business," *Newsday* at 21 (Feb. 12, 1989) (teenage street dealers hide their drug stashes in the rubble of abandoned lots and retrieve only the amount needed for each drive-by sale).

7.  *See* Kleinman, *supra* at n. 6; *cf.* "Anti–Drug Unit Hits W. Phila.," *supra* at n. 6; Queen, *supra* at n. 6;

8.  *See* Hopkins, *supra,* at 123 (recently, street drug dealers have begun to sell *pre-packaged cocaine* and *heroin* at the same sites).

9.  We note that *possession* of *cocaine and heroin* for *personal use* by a juvenile would have more than warranted an adjudication and disposition for delinquency, had intent to deliver not been proved. Keeping in mind the Juvenile Act's purpose, it would arguably present an even more compelling justification to intervene more intrusively in his upbringing by imposing conditions on probation designed to prevent the ravages of addiction, as well as to prevent the delinquency involved in the illegal purchase and/or possession of drugs. Indeed, had *use* of cocaine and heroin been established, referral to a juvenile facility to ensure compliance with drug treatment might have been appropriate.

10. *See generally Commonwealth v. Karns,* 389 Pa.Super. 58, 65, 566 A.2d 615, 619 (1989); *Commonwealth v. Smagala, supra,* 557 A.2d at

fact that an individual possesses only a small amount of one or more controlled substances is but one of many factors to be considered in determining whether possession was for sale or delivery, or for personal use.[11] Here, the relevant facts and circumstances rebutted any inference of possession for personal use, and raised a compelling inference of possession with intent to deliver.

## IV.  *Disposition*

■ This case is illustrative of another aspect of the drug problem—the manner in which it robs our youths of their future employment capacity in the legal economy.  In our information oriented society, education is a critical key to legal employment opportunities.  Unfortunately, a juvenile's education is often the first casualty when a juvenile gets involved with drugs.  *See* Williams, *The Cocaine Kids, supra,* at 65–66, 74–79, 132.  Indeed, it has been aptly observed that the "greatest common denominator" among all delinquents "is that they don't go to school."  Kramer, *At A Tender Age, supra,* at 97.

Appellant was no exception.  The public defender indicated that since coming to Pennsylvania from Puerto Rico "a year and a few months" earlier he had attended school only "three months."  (N.T. 11/9/88 at 26).

Of course, there is no mercy in letting a juvenile have his own way in plunging headlong to destruction.  Nor is there mercy in sending a juvenile offender back to everything that brought him before the court with nothing more than a stern lecture.  We have learned by costly experience that

351–52 (collecting cases); *Commonwealth v. Pagan, supra,* 461 A.2d at 322 (collecting cases).

**11.** *See generally* Annotation, *Sufficiency of Evidence That Possessor of Cocaine Had Intent to Distribute It,* 80 A.L.R.Fed. 397 (1986 & 1988 supp.); Annotation, *Sufficiency of Evidence That Possessor of Heroin Had Intent to Distribute It,* 78 A.L.R.Fed. 413 (1986 & 1988 supp.); Annotation, *Sufficiency of Evidence That Possessor of Controlled Substance Other Than Cocaine, Heroin, or Marijuana Had Intent To Distribute It,* 80 A.L.R.Fed. 507 (1986 & 1988 supp.); Annotation, *Sufficiency of the Evidence That Possessor of Marijuana Had Intent To Distribute It,* 79 A.L.R.Fed. 113 (1986 & 1988 supp).

society can ill afford the expense of the *unsupervised* probation folly of—law gets juvenile, law loses juvenile, law gets adult when its too late to successfully rehabilitate. *Cf.* Kramer, *supra* at 136 (to the same effect). As has been noted earlier, the juvenile justice system's "slap-on-the-wrist" response to this kind of delinquency is one of the major factors which led to juvenile involvement in the drug-trafficking industry in the first place.

A firm but proportionate response is required. We note that this case illustrates one such response.

As a first offender, appellant was placed on probation. However, two noteworthy conditions were imposed. First, probation was expressly conditioned on school attendance. If enforced, this condition will extend to appellant a opportunity for self improvement and rehabilitation, while at the same time reducing the amount of time available to appellant to engage in destructive activities. Second, appellant was ordered to perform 70 hours of community service, thus imposing burdensome consequences on appellant for his misconduct, which at the same time will provide restitution to the community and an opportunity for appellant to form a positive attachment to the community. This, of course, assumes that the community service involves real service to the community for the full 70 hour requirement imposed.

In theory this is an idyllic response. Whether it will work in practice will depend initially upon whether appellant's parents and the probation authorities ensure strict enforcement of the conditions of probation. Ultimately, success or failure will depend on appellant. Neither he, nor this Commonwealth, can afford to waste this opportunity. If appellant violates probation or commits a subsequent offense as a juvenile or as an adult, the need for incapacitation to safeguard the community would rise while the hope of rehabilitation would dwindle; thus presenting an entirely different calculus should appellant stand before the

598

court again to collect the wages of further illegal conduct or a violation of his probation.

Order affirmed.

TAMILIA, J., files a concurring statement.

TAMILIA, Judge, concurring:

I concur in the result rather than join the majority Opinion as I believe the majority has indulged in a sociological dissertation and inclines toward justifying the result because of external reports of media and other sources rather than the facts or law of the case.